## UNITED STATES v. KOSKEY.
### No. 7334.

Circuit Court of Appeals, Ninth Circuit.
June 11, 1934.

Peirson M. Hall, U. S. Atty., Hugh L. Dickson, Asst. U. S. Atty., and Madison L. Hill, Atty., Department of Justice, all of Los Angeles, Cal., Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., and Wilbur C. Pickett and Tom De Wolfe, Sp. Assts. to Atty. Gen., for the United States.

R. A. McKay and Allan Brant, both of San Diego, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

James A. Koskey enlisted in the United States Army April 26, 1918, and served until June 13, 1919. He obtained a policy of war risk insurance for $10,000 which lapsed on August 2, 1919. He became ill in May, 1920, with encephalitis lethargica and was in a state of coma for six weeks. On December 23, 1931 James A. Koskey, through George A. Koskey, his guardian, brought suit against the United States on this policy of war risk insurance, alleging maturity thereof on August 2, 1919, by reason of total and permanent disability of plaintiff as a result of encephalitis lethargica. Plaintiff had been rated by the Veterans' Administration for compensation purposes as totally and permanently disabled from May 7, 1920, as a result of said disease. Judgment was entered for plaintiff on March 28, 1933. From this judgment the United States appeals.

The only question involved in the appeal is whether there was any substantial evidence of total permanent disability of appellee on or before the policy lapsed, August 2, 1919.

The judgment is based upon the finding of the trial court that the veteran was afflicted with the disease before his war risk insurance lapsed and was then totally and permanently disabled thereby. This conclusion so far as it is supported at all is based upon medical testimony given in response to hypothetical questions purporting to be based in part upon the condition of the veteran before his acute attack in May, 1920. That evidence we will now briefly state.

After plaintiff was discharged from the army he did very light work in a pool hall in Calexico. While there he ate his meals in a restaurant, and Regas Regapolis, a waiter there, testified that he had met plaintiff in July, 1919, served him in the restaurant where he worked as a waiter, and knew him for a period of four or five weeks, during which time plaintiff seemed very absent-minded about giving his orders to witness; that he would stare for a matter of eight or ten seconds before replying to the inquiry of witness as to what plaintiff wanted, and then answer.

George Polis testified he had been in the restaurant business with plaintiff before the war and that plaintiff was a very active, efficient waiter, taking care of about 25 chairs at a counter himself; after returning from the war witness operated a restaurant and hired plaintiff during a part of January, February, and March, 1920, to work as a waiter, which he did for a few weeks, but that plaintiff was very absent-minded, "a customer would ask for sugar and he would give him salt, or a cup of coffee and he would bring him water," and finally plaintiff became disgusted with himself, said he could not carry on the work, gave it up, and went back to the pool hall where he had previously worked, as it was light work.

He was asked: "Was he sick during the period from September 1, 1919, to May, 1920, or up to the time he left your restaurant?" He answered: "Perhaps he was losing a day or two occasionally but not enough to lay off

entirely from his work." The witness also stated that the veteran had a peculiar look, sometimes staring off into space, and complained of being ill.

Service records and reports of medical examinations subsequent to May, 1920, were introduced by plaintiff by stipulation, including the report of neuropsychiatric examination, United States Public Health Service, Bureau of War Risk Insurance, made November 14, 1923, giving the personal history of plaintiff from birth to the present, stating he was a normal child and rather unusually healthy; "after enlistment plaintiff did full duty until July, 1918, when he was hospitalized and operated upon for hernia; remained in hospital about two months; returned to duty and did full duty until November [1918] when he was sent back to hospital suffering with influenza from which he recovered without complications; was discharged June 15, 1919, receiving a straight discharge."

Dr. Thomas Coe Little, called as an expert medical witness, testified that he had first seen the veteran in May, 1920, when he was in a state of coma, which he diagnosed as encephalitis lethargica, or sleeping sickness. He was then asked an hypothetical question, or assumed as facts the testimony that had been given and assumed:

"That this man's condition was such as I have said it was in May, 1920, and that during the last few days of July, 1919, and the month of August, 1919, this man, who prior to this trouble had had a normally alert mind, * * * and assuming that in January, 1920, while working in a restaurant, that he was absent minded, nervous and forgetful, so that he couldn't take orders properly from patrons of the place; and assuming that before he had gone into the United States Service in 1918 he had an alert mind, and was a very competent waiter; and assuming that in November, 1918, while in the service in France, he was in a hospital suffering from influenza; *and presuming that his conduct and behavior as evidenced by his lack of attention* and his inability to correlate various attributes of his mind during the period of July and August, 1919, and that this *was due to the condition existing at the time I saw him in May, the onset of the disease must have antedated June or July, 1919* * * *.

"Assuming that he was suffering or had contracted during the month of July, 1919, encaphalitis lethargica, my opinion with reference to his being totally and permanently disabled from following continuously any substantially gainful occupation, is that he was totally and permanently disabled in July, 1919."

It will be noted that the witness thus was required to assume that the symptoms of July, 1919, et seq., were the result of encephalitis lethargica, and consequently state upon the assumption that he had the disease in July or August that the inception of the disease must have antedated June or July, 1919. In other words, if he had the disease in July, 1919, he must have acquired it as early as July or June. This testimony of course is of no assistance in bridging the chasm between June, 1919, and May, 1920, on the question of total and permanent disability. This is manifest by the cross-examination of the witness in which he was shown a report dated January 1, 1933, which he had made to the Veterans' Bureau, relative to which he testified as follows:

"Q. Is this correct 'It is my opinion that there is absolutely no connection between his disability that he was suffering from in 1920 and 1921, and still suffers from, with his military service'? * * *

"The witness: Yes, that is my statement, and that is my opinion at the present time. * * *

"Q. You just stated, Doctor, that that statement was correct, did you not? A. Yes, his encephalitis would not antedate his discharge from the service.

"Q. Do you still think it has no connection with it? A. He was given an examination at the time he left the service, and there is no evidence—I am informed that he was in good health at the time he left the service, which was at the time—sometime in 1919 I think. * * *

"The Court: When did he have influenza?

"Mr. Andrews: There is no evidence in the record, whatever, your Honor.

"The Court: That is why I asked that.

"Mr. Andrews: There is no evidence in the record of influenza."

Dr. Little further testified that encephalitis lethargica is a very slow, degenerative disease and it would be hard to say when it started; even if he had had influenza in 1918, a year or a year and four months before he diagnosed it, he might or might not have had the onset of encephalitis lethargica in connection with his attack of influenza. He said: "It might have had its inception in November, 1918, or the inception might have been more recent. The onset of it is an acute inflammatory thing, and then a slow degenerative change."

No other expert witness testified for the plaintiff.

Dr. Will H. Porter, for the defendant, testified he is experienced in nervous and mental disease and has made a study of encephalitis lethargica. He testified that assuming the condition of plaintiff to be as testified to up to May, 1920, when he became ill with this disease, "it is my opinion that the encephalitis lethargica must have been rather a sudden onset because of the virulence of the infection —the severity of the infection, producing the coma almost immediately after he was taken ill. * * * While it is not definitely known, it is supposed to follow some acute infection, often the respiratory infection. Influenza frequently precedes it. We have no definite knowledge of the period between a respiratory infection and the onset of the disease such as a coma. * * * I would say that the interval would be months rather than a year or two. I think the average period would be seven or eight months."

Dr. H. F. Andrews, director of a psychopathic hospital, testified for the defendant as follows: "The source of the infection in cases of encephalitis, we do not know other than it is most prevalent during epidemics of respiratory diseases. Influenza is one such disease. * * * We have absolutely no accurate opinion as to how long a period elapses between the respiratory infection and the onset of the disease of encephalitis lethargica. * * * In a period of epidemic and severe cases of encephalitis lethargica seem to follow closely in period of time upon some respiratory infection."

The period between the respiratory infection and the onset of the disease is speculative.

■ It is clear that the veteran did in fact work at a gainful occupation for some months after his discharge, and that he was able to do so unless it can be said that because of the existence of a dormant disease, unknown to himself or to any one else, it was harmful to his health for him to do so. The evidence clearly shows that medical science is as yet unable to say when these germs of disease, if such there are, invade the human system. In order to recover upon substantial evidence the plaintiff must show with reasonable certainty that he was inflicted with this disease at a time when his policy was in effect. The medical experts cannot do so and they say the matter is uncertain. A judgment based upon such testimony cannot stand. The testimony of Dr. Little, above quoted, based upon the assumption of the fact in dispute is valueless.

Judgment reversed.